### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO:  12-61521-CIV-DIMITROULEAS/SNOW

STONEGATE BANK, a Florida
corporation,

           Plaintiff,

v.

TD BANK, N.A.,

           Defendant.

_____/

### DEFENDANT TD BANK, N.A.'S MOTION FOR SUMMARY JUDGMENT
### ON ALL COUNTS OF THE COMPLAINT

      Pursuant to Fed. R. Civ. P. 56 and Local Rules 7.1 and 56.1, Defendant TD Bank, N.A.

("TD Bank") respectfully moves for summary judgment on all counts of Stonegate Bank's

("Stonegate") Complaint.[1]

## I.  Summary of Argument

      The Participation Agreement expressly vested TD Bank with the authority to sell the

subject loan to the borrower after obtaining either 75% approval of the Participation Interests

under Section 16(b), or 50% approval of the Participation Interests under Section 16(e).  It is

undisputed that 86.61% of the Participation Interests approved, in writing, the sale of the loan for

$9 million after the borrower defaulted, and signed written consents that were part of the Loan

Sale Agreement with the borrower.  Therefore, under the unambiguous terms of the Participation

Agreement, TD Bank was authorized by the requisite percentage of the Participating Banks'

Participation Interests to sell the loan.

---

[1] Stonegate filed on March 21, 2013 a "Motion for Judgment on the Pleadings or, Alternatively for Summary Judgment as to Counts I and II (DE 36).  TD Bank filed its Opposition Memorandum on May 3, 2013. (DE 47).

Several cases, discussed below, support TD Bank's sale of the Loan at a discount upon default by the Borrower after obtaining the signed consent of 86.61% of the Participation Interests, despite Stonegate's failure to consent to that resolution.  In particular, in <u>Southern Pacific Thrift & Loan Assn. v. Savings Assn. Mtg. Co., Inc.</u>, 70 Cal. App. 4th 634, 642, 82 Cal. Rptr. 2d 874 (Cal. Ct. App. 1999), the court affirmed a lead bank's "workout" settlement with a borrower which had defaulted, resulting in the borrower paying less than the balance owed, despite the objection by a participating bank with a 29% interest.  The majority of the participants approved the settlement pursuant to a provision in the participation agreement providing that the lead bank could not waive or modify any term of the loan agreement absent the written consent of more than 50% of the participation ownership interests.

### B.    Facts

Mercantile Bank ("Mercantile") acquired a 28.5714% Participation Interest in a loan dated April 12, 2006 in the amount of $26,925,557.21 (the "Loan") made to Chaven Investments, LLC (the "Borrower").  The Borrower obtained the Loan from Fairfield Financial Services, Inc. ("Fairfield"), the Originating Bank, to purchase a marina in Jacksonville, Florida in a project known as "Palm Cove Marina."  (Flint Decl., DE 47-1, at ¶ 4).[2]

Mercantile, which was later acquired by TD Bank, was originally a Participating Bank under a Participation Agreement dated April 12, 2006 (the "2006 Participation Agreement") between Mercantile and Fairfield (which was the Originating Bank), and 13 other Participating Banks. (Flint Decl. at ¶ 3; *Ex. A*, DE 47-2, to Flint Decl.).  The 2006 Participation Agreement was amended twice, and re-executed by Fairfield and Mercantile on October 12, 2007 (the "2007

---

[2] TD Bank previously filed Flint's Declaration (DE 47-1) in opposition to Stonegate's Motion for Summary Judgment.  TD Bank filed Flint's Supplemental Declaration on June 5, 2013 (DE 58-1).

Participation Agreement") (Id.; ***Ex. B***, DE 47-3, to Flint Decl.) and March 26, 2008 ("Mercantile's 2008 Participation Agreement") (Id.; ***Ex. C***, DE 47-4, to Flint Decl.).

Stonegate's predecessor, Integrity Bank ("Integrity"), executed the 2006, 2007, and 2008 Participation Agreements (DE 47-21, DE 47-22, and DE 47-23, respectively).  Integrity's March 26, 2008 Participation Agreement with Fairfield, which is attached as ***Ex. A*** to the Complaint, is referred to herein as the "Participation Agreement." [3]

Mercantile's Participation Interest of 28.5714% equated to $8 million of the total Loan amount.  Integrity's Participation Interest was 10.7142%, which equated to $2,884,858.05 of the total Loan amount. (Flint Decl. at ¶ 4; Compl. at ¶ 8; ***Ex. A*** to Compl. at p. 2).

The Originating Bank and all 14 Participating Banks signed the identical Participation Agreements in 2006, 2007, and 2008, except that their specific Participation Interests were identified in their respective agreements, and except that Mercantile's March 26, 2008 Participation Agreement contained certain revisions that had been requested by Mercantile. (Flint Supp. Decl. at ¶ 6, DE 58-1).

On June 9, 2009, Mercantile acquired the Participation Interest of Fairfield of .0008%, which equated to $131.30.  (Flint Decl. at ¶ 6; ***Ex. D***, DE 47-5, to Flint Decl.).  This reduced the number of Participating Banks to 13.  At that time, all of the Participating Banks consented to Mercantile replacing Fairfield (which had at that time changed its name to Security Real Estate Services, Inc.) as the Originating Bank, including Integrity, Stonegate Bank's predecessor in interest.   Mercantile agreed to accept the role as Originating Bank under the individual Participation Agreements dated March 26, 2008 signed by all of the Participating Banks. (Flint Decl. at ¶ 6).

---

[3] All capitalized terms in this Memorandum have the meanings ascribed to them in the Participation Agreement.

Section 2(b) of the "Loan Sale and Assignment of Participations Agreement" dated June 9, 2009 between Mercantile and Security Real Estate Services, Inc. (f/k/a Fairfield) provided that "Buyer [Mercantile] shall assume, at the Closing, all of the obligations and liabilities of Seller [Fairfield] under the Loan, Loan Documents, Participation Documents and Participation Agreements of every kind including the Administrative Duties …" (DE 47-5). Accordingly, Mercantile became the Originating Bank under all of the Participating Banks' Participation Agreements, including Integrity's (later, Stonegate's) Participation Agreement dated March 26, 2008.

On August 9, 2009 (more than 16 months after Integrity Bank signed the Participation Agreement), Stonegate acquired Integrity Bank's Participation Interest from the FDIC. (Barnhart Dep. at p. 10; *Ex. B* to the Compl.). Stonegate had no involvement in the negotiation or drafting of the Participation Agreement. (Barnhart Dep. at p. 136).

Thereafter, in approximately June 2010, TD Bank acquired Mercantile and replaced Mercantile as the Originating Lender.

The Loan's maturity date was extended twice with the consent of all the Participating Banks, including Stonegate. (Flint Decl. at ¶ 8; Barnhart Dep. at pp. 24, 26). Pursuant to the "Note and Loan Extension Agreement" dated March 14, 2011, the Loan's maturity date was extended from January 12, 2011 to April 12, 2011. (***Ex. F***, DE 47-7, to Flint Decl.). Later, pursuant to the "Second Note and Loan Extension Agreement" dated May 27, 2011, the Loan's maturity date was extended from April 12, 2011 to September 12, 2011. (***Ex. G***, DE 47-8, to Flint Decl.).

On September 12, 2011, the Loan fell into default. All of the Participating Banks agreed to send a formal letter through TD Bank's counsel to the Borrower declaring it in default.

Accordingly, TD Bank's counsel sent a default letter to the Borrower dated October 31, 2011, which demanded payment of the entire balance owed, which at the time was $16,460,663.84. (Flint Decl. at ¶ 8; ***Ex. H***, DE 47-9, to Flint Decl.).

On October 27, 2011, all Participating Banks, including Stonegate, agreed to pursue a Loan Sale with the Borrower and authorized TD Bank to negotiate such a sale in lieu of filing litigation.  (Flint Decl. at ¶ 12; ***Ex. I***, DE 47-10, to Flint Decl.).   Barnhart advised Flint on October 27, 2011 that Stonegate would agree to a $9 million loan sale. (DE 47-11)  Later, on November 7, 2011, Barnhart said Stonegate would agree to $10 million (DE 47-12), and then on November 18, 2011, he said Stonegate would agree to $12 million (DE 47-13).  (See also Flint Decl. at ¶¶ 13, 14, 15).

On December 6, 2011, the Borrower sent TD Bank a letter with a proposed letter of intent stating, in part, that its "best and final" offer to purchase the Loan was $9 million cash. (***Ex. N***, DE 47-15, to Flint Decl.).

On December 13, 2011, the Participating Banks voted on the proposed Loan Sale, and 73.21% of the Participation Interests voted at that time in favor of the Loan Sale to the Borrower for $9 million cash (with three lenders not having cast their votes yet). (Flint Decl. at ***Ex. P***, DE 47-17).  Flint sent the Participating Banks a spreadsheet with the lender votes and asked for confirmation of their votes.  (***Ex. P***, DE 47-17, to Flint Decl.).

On December 13, 2011, Barnhart emailed Flint, "our no is confirmed."  (***Ex. Q***, DE 47-18, to Flint Decl.).  Barnhart testified that TD Bank did not try to influence Stonegate's vote. (Barnhart Dep. at p. 88).  Stonegate did not take the position that TD Bank did not have the authority under the Participation Agreement to sell the Loan.  (Flint Decl. at ¶ 20).

On or about December 15, 2011, 86.61% of the Participation Interests reached, in writing, an agreement to sell the Loan under Section 16(b), and a "mutually agreeable course of action" to sell the Loan under Section 16(e).  (Flint Decl. at ¶ 21).  Only two Participating Banks voted "no": Stonegate (which held a 10.7142% Participation Interest) and Trust Bank (which held a 2.68% Participation Interest).  Id.  Stonegate does not dispute that 86.61% of the Participation Interests approved the Loan Sale.  (Barnhart Dep. at pp. 36-37).

Also on December 15, 2013, Flint sent all Participating Banks, including Stonegate, a draft of the proposed Loan Sale Agreement. (DE 47-26).

A week later, TD Bank and the Borrower entered into a Loan Sale Agreement (the "Loan Sale") (signed on December 21, 2011 by the Borrower and on December 27, 2011 by TD Bank). (*Ex. R*, DE 47-19, to Flint Decl.).  Appendix I to that executed Loan Sale Agreement contains the signed consents of 86.61% of the Participation Interests of the Participating Banks.  Id.

On December 28, 2011, Stonegate's Barnhart forwarded to Stonegate's chief executive officer, David Seleski, Flint's e-mail of the same date sent to all Participating Banks advising them that the Loan Sale had closed and that TD Bank received the Loan Sale proceeds and would be disbursing them the next day. (*Ex*. **6**, DE 47-24).   In that internal Stonegate email, Seleski responded to Barnhart, "I will get Hardin [Stonegate's attorney] working on the complaint."  Id.

On approximately December 29, 2011,[4] TD Bank wired $962,659.39 to Stonegate Bank, representing the full amount owed to Stonegate from the proceeds of the Loan Sale based upon Stonegate's 10.7142% Participation Interest.  Stonegate accepted the funds.  Again, Stonegate did not take the position that the Loan Sale was unauthorized under the Participation Agreement.

---

[4] TD Bank's Opposition Memorandum to Stonegate's Summary Judgment Motion (DE 47) incorrectly stated that this date was December 29, 2012.  TD Bank's counsel apologizes for that typographical error.

(Flint Decl. at ¶ 23).  (See also Barnhart Dep. at p. 62 ("I don't recall" if I told TD Bank that Stonegate considered a sale of the Loan impermissible under the Participation Agreement)).

A month and a half later, Stonegate's counsel sent a demand letter dated February 16, 2012 to TD Bank claiming, for the first time, that the Loan Sale was unauthorized under the Participation Agreement.  (Ex. C to Compl.; Flint Decl. at ¶ 23).

TD Bank incurred the same pro rata loss as all of the Participating Banks.  The total loss on the Loan was approximately $7.4 million.  TD Bank's loss on the Loan, based upon its 28.5714% Participation Interests, was approximately $2.1 million.  Id. at ¶ 24.

Stonegate does not dispute that it was fully paid for its Participation Interest based upon the $9 million sale.  Rather, Stonegate claims it is owed an additional $790,825.66 by TD Bank for its Participation Interest, which is the amount Stonegate would have received had the Borrower repaid the Loan in full.  (Stonegate's Rule 26 Disclosures) (***Ex. 7***).

The Complaint asserts three counts: Count I, for breach of contract (specific performance); Count II, for breach of contract (for damages); and Count III, for willful misconduct.

The Complaint alleges that Stonegate's approval was required to sell the Loan.  The Complaint never cites or refers to Sections 16(b) or 16(e).

### III.  Argument

#### A.     TD Bank is Entitled to Summary Judgment as a Matter of Law

#### 1.     Legal Standard Governing Summary Judgment Motions

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Morales v. Zenith Insur.

Co., 714 F.3d 1220, 1226 (11th Cir. 2013).  The court "review[s] the evidence, viewing all facts

in the light most favorable to the non-moving party."  Id.  (citation omitted).

### 2. Georgia law Governing Contract Interpretation[5]

Under Georgia law,

> [t]he construction of contracts involve three steps.  At least
> initially, construction is a matter of law for the court.  First, the
> trial court must decide whether the language is clear and
> unambiguous.  If it is, the court simply enforces the contract
> according to its clear terms; the contract alone is looked to for its
> meaning.  Next, if the contract is ambiguous in some respect, the
> court must apply the rules of contract construction to resolve the
> ambiguity.  Finally, if the ambiguity remains after applying the
> rules of construction, the issue of what the ambiguous language
> means and what the parties intended must be resolved by a jury.

Simpson v. Infinity Select Insur. Co., 269 Ga. App. 679, 681, 605 S.E.2d 39, 41-42 (Ct. App. Ga.

2004) (citations omitted); see also Maiz v. Virani, 253 F.3d 641 (11th Cir. 2001) (same).

"The existence or non-existence of an ambiguity is a question of law for the court.  If the

court determines that an ambiguity exists, however, a jury question does not automatically arise,

but rather the court must first attempt to resolve the ambiguity by applying the rules of

construction in [Georgia Statute] § 13-2-2."  Simpson, 269 Ga. App. at 681.

Under Georgia Statute § 13-2-3, "[t]he cardinal rule of construction is to ascertain the

intention of the parties.  If that intention is clear and it contravenes no rule of law and sufficient

words are used to arrive at the intention, it shall be enforced irrespective of all technical or

arbitrary rules of construction."

### 3. Sections 16(b) and 16(e) of the Participation Agreement

Section 16 of the Participation Agreement, titled "Administration of Loan," provides that

the Participating Banks are authorized to take certain actions based upon a requisite percentage

---

[5] Georgia law governs the "interpretation, validity, and enforceability" of the Participation Agreement. (**Ex. A** to Compl., at section 20).

of approval by the Participation Interests.  Sections 16(b) and 16(e) provide, in their entirety, as

follows:

      b.      Without the prior written consent of the holders of ***75% or more*** of the outstanding interest in the Loan, Originating Bank shall not: (i) make or consent to any ***modification, amendment, or termination of any of the material terms or conditions of the Loan Documents (without limiting the foregoing, a "material" term includes the interest rate, the specific collateral pledged, guaranties made, scheduled term and maturity date, required covenants, and like provisions)***, (ii) make or consent to any release of any guarantor or release modification, substitution or exchange of any of the Collateral given as security for the Loan, (iii) accelerate the maturity date of the Loan; make or consent to any extension or renewal of the Loan; or (iv) commence any foreclosure or other legal action or proceeding for the collection of the Loan. (Emphasis added).

. . .

      e.      Upon becoming actually aware of a default by Borrower(s) under any of the Loan Documents or with respect to the Collateral, or any event which, with the giving of notice or passage of time or both, would constitute a default thereunder, Originating Bank immediately shall notify Participating Bank of such default or event, and Originating Bank and Participating Bank shall thereafter attempt to ***mutually agree upon a course of action*** within sixty (60) business days.  ***If, within sixty (60) business days a mutually agreeable course of action cannot be decided by the holders of 50% or more of the outstanding interest in the Loan***, Originating Bank shall (i) accelerate the maturity of the Loan, (ii) demand payment of the [L]oan, and (iii) take appropriate action to collect the Loan. (Emphasis added).

(***Ex. A*** to Compl. at p. 9).

      4.    **Sections 16(b) and 16(e) of the Participation Agreement Both Authorized the Sale of the Loan**

Under the unambiguous language of Sections 16(b) and 16(e) of the Participation Agreement, the sale of the Loan was authorized with 86.61% approval and written consent of the Participation Interests.

      a.    **Section 16(b)**

Section 16(b) authorized TD Bank to sell the Loan upon 75% of the Participation Interests agreeing to the sale and approving it in writing.

First, a sale of the Loan is expressly authorized under Section 16(b)'s clause "termination of any of the material terms or conditions of the Loan Documents." A loan sale is specifically included in the defined term "Loan Documents" under Sections 16(a) and 8 of the Participation Agreement. Section 16(a) defines "Loan Documents" as "the Note[s] and all other documents evidencing the Loan, guaranteeing or providing security for the Loan or containing agreements with respect to the <u>sale</u> or repayment of the <u>Loan</u> (collectively, the "Loan Documents"). (Emphasis added). <u>See also</u> Section 8 (also defining "Loan Documents" as including "sale or repayment of the Loan"). Therefore, the Participation Agreement (including Sections 8, 16(a), and 16(b)) expressly authorizes a sale of the Loan.[6]

Second, even if Section 16(b) had not expressly defined Loan Documents to include a sale of the Loan, it cannot be disputed that "termination of any of the material terms or conditions of the Loan Documents" includes termination of the Borrower's obligation to fully

---

[6] Stonegate argued in its Reply in support of its Motion for Summary Judgment (DE 57, at p. 3) that a loan sale could not apply to Section 16(b) because when the Participation Agreement was entered into, no loan sale had yet occurred. It argued that 16(b) "cannot be read to justify the creation and de facto approval of loan sale documents that do not exist." <u>Id.</u> This argument is meritless. There is nothing unusual or remarkable about a contract governing the parties' future conduct or execution of subsequent documents. Indeed, under Stonegate's interpretation, the sale-of-loan language in the "Loan Documents" definition throughout the Participation Agreement would never apply and thus be meaningless since no loan sale agreement existed at the time the parties entered into the Participation Agreement.

repay the Loan balance.  The principal amount of the Loan is a material term.  <u>See</u> Barnhart Dep. at p. 46.

Stonegate incorrectly argued in its Reply (DE 57, p. 5) that "the Loan Sale Agreement does not modify, amend or terminate a single term or condition of the Loan Documents . . ." The Loan Sale Agreement (DE 47-19) modified and amended the obligee – the Borrower replaced TD Bank as the obligee under the Note.  Moreover, the Borrower no longer had any other obligations to TD Bank under the Loan Documents, and the Loan Sale Agreement resulted in the release of the Loan's collateral and termination of the guaranties previously given to TD Bank.

Additionally, Section 16(b) states that 75% of the Participation Interests may "make or consent to [a] modification, amendment, or termination of ***any*** of the material terms or conditions of the Loan Documents."  (Emphasis added).  Under Georgia law, "the word 'any' may be used to mean 'all' or 'one out of several.'"  <u>Madison, Ltd. v. Price</u>, 146 Ga. App. 837, 842, 247 S.E.2d 523, 526 (Ct. App. Ga. 1978).

Third, the phrase "without limiting the foregoing" must be given its expansive effect. <u>See</u> <u>Deep Six, Inc. v. Abernathy</u>, 246 Ga. App. 71, 74, 538 S.E. 2d 886, 889 (Ct. App. Ga. 2000) ("The use of 'any and all' and 'but not being limited to' seems calculated to give the most expansive application possible"; the court noted that the 'but not being limited to' language "would be rendered meaningless" if the court interpreted that provision to exclude other items). <u>Cf. Hunt v. Hawthorne Assocs., Inc.</u>, 119 F.3d 888, 910-11 (11th Cir. 1997) (interpreting the phrase "including, but without limiting the generality of the foregoing" as "encompass[ing] other scenarios" under a plan under the Employee Retirement Income Security Act of 1974).

Stonegate's interpretation would render the phrase "without limiting the foregoing" (which immediately follows the language "make or consent to any modification, amendment, or termination of any of the materials terms or modifications of the Loan Documents") meaningless, or at a minimum superfluous.  Under Georgia law, "[n]o contractual provision should be rendered meaningless, nor any of its terms mere surplusage." Duke Galish, LLC v. Manton, 308 Ga. App. 316, 319, 707 S.E.2d 555, 558 (Ct. App. Ga. 2011). See also Nationwide Mutual Fire Insur. Co. v. Dillard House, Inc., 651 F. Supp.2d 1367, 1377, n.12 (N.D. Ga. 2009) ("courts avoid interpreting contract provisions in a way that leaves another provision meaningless or superfluous").

Section 16(b) on its face cites non-exhaustive examples of modifications, amendments, and terminations "of any of the material terms or conditions of the Loan Documents …" (Emphasis added).  Bolstering this construction is the fact that no carve-out language appears excepting a loan sale.  If Section 16(b) had intended to exclude a loan sale – or a discounted pay-off, or any other type of settlement with the Borrower for less than the Loan balance – Section 16(b) would have stated so.

The termination of the material terms of the Loan can be effectuated in a variety of ways. For example, a settlement with a borrower wherein the participating banks accept an amount less than the loan balance would result in the termination of the borrower's obligations under its loan. Acceptance of a deed in lieu of foreclosure to settle the debt would, too.  Section 16(b) does not distinguish between the various vehicles the Participating Banks can employ to mitigate their credit risk when faced with a non-performing loan.   Under all the above scenarios, the Borrower's obligations under the Loan are extinguished and the Borrower is released.

     b.    **Section 16(e)**

Section 16(e) authorized TD Bank to sell the Loan after the Borrower defaulted, upon 50% of the Participation Interests agreeing to the sale and approving it in writing.

Section 16(e) specifically addresses the Participating Banks' options when faced with the Borrower's default.  It provides that upon the Originating Bank's notifying the Participating Banks of a default, "Originating Bank and Participating Bank[s] shall thereafter attempt to mutually agree upon a course of action within sixty (60) business days . . ." (Emphasis added).  That section then goes on to set out the Originating Bank's obligations in the event 50% of the Participation Interests could not "decide[ ]" on a "mutually agreeable course of action." (Emphasis added).  Section 16(e) uses the verb "decided" – refuting Stonegate's interpretation that Section 16(e) only allowed the Participating Banks to "agree to a plan" (Stonegate's Summary Judgment Motion, DE 36 at p. 13).  Moreover, Section 16(e) allows the Participating Banks to "agree upon a course of action" – again refuting Stonegate's interpretation that the Participating Banks were restricted to agreeing only to a "plan."

Section 16(e) does not contain any carve-out language precluding certain types of resolutions with the Borrower.  For example, Section 16(e) does not state: "provided, however, no mutually agreeable course of action shall include a Loan Sale for less than the full amount of the loan balance, or a discounted pay-off or other type of settlement with the Borrower for less than the full amount of the Loan balance."  Had the Participating Banks intended to limit their options under Section 16(e), they would have explicitly said so.

Stonegate argued in its Reply (DE 57, at p. 71) that "the only authority delegated to TD Bank under Section 16(e) is the authority to 'i) accelerate the maturity of the Loan, ii) demand

payment of the [L]oan, and iii) take appropriate action to collect the Loan.'"  This argument is simply incorrect, as a matter of law.  It directly conflicts with Section 16(e)'s express language.

It is undisputed that 86.61% of the Participation Interests reached a mutually agreeable course of action under the Participation Agreement, approved the Loan Sale for $9 million, and signed written consents that were appended to the Loan Sale Agreement with the Borrower. (Barnhart Dep. at pp. 35, 36-37; Flint Dep. at pp. 21-22; *Ex. R*, DE 47-19, to Flint Decl.).

### c.   Case Law Supporting the Loan Sale

In Southern Pacific Thrift & Loan Assn v. Savings Assn. Mortgage Co., Inc., 70 Cal. App. 4th at 634, 82 Cal. Rptr. 2d 874 (Ct. App. 1999), the court held that the originating bank under a participation agreement had the right to settle with the borrower for less than half the loan balance because it obtained the written consent of more than 50% of the ownership interests.

In Southern Pacific, the originating lender under a participation agreement sent a memorandum to all participants setting forth a "workout proposal" of the defaulted loan pursuant to which the participating banks would receive $800,000 to fully satisfy the loan balance of $2,083,629.  Id. at 638. The lenders voted on whether to accept the workout or, instead, to foreclose.  The plaintiff lender, which had a 29.32% interest, voted for foreclosure; other loan participants holding an aggregate interest of 60.67% voted in favor of the workout.  Id. at 638-39.  The lead bank proceeded to consummate the workout.  Id.  The appellate court affirmed the trial court's ruling that the originating bank "was authorized to engage in the shortpay negotiations and to release the security" under a provision that provided that the originating bank "will not waive or modify any right, term or provision of any loan contract under this Agreement, including the right to exercise the due-on-sale clause, without the prior written

consent of the owner of a participation ownership interest that exceeds 50% in the pertinent loan(s) . . ." <u>Id.</u> at 640.

Notably, the court rejected the dissenting lender's argument that another provision in the agreement required the originating bank to either repurchase the dissenting lender's interests or foreclose.   The dissenting lender also argued that because a provision of the participation agreement provided the originating bank with the authorization to perform certain specific acts upon a default, the originating bank was not authorized to enter into the workout settlement with the borrower since it was not one of the enumerated specific acts.   The court rejected this argument as well.

In <u>New Bank of New England, N.A. v. The Toronto-Dominion Bank</u>, 768 F. Supp. 1017 (S.D.N.Y. 1991), a minority lender argued that under a credit agreement, the majority lenders were required to accelerate the loan and foreclose.   The key provision at issue provided that "the agent [lead bank] *may* act in certain circumstances in accordance with the directions of the majority lenders . . ." <u>Id.</u> at 1020 (Emphasis in original).   The court held:

> However, the document specifically provides that upon [borrower's] default the vote of a majority of the Lenders is required in order to exercise the remedies of acceleration and foreclosure.  There is no provision in the Senior Credit Agreement for a minority lender such as [plaintiff] to compel such an acceleration and foreclosure, and indeed, no provision which even suggests such authority.

<u>Id.</u> at 1022.

Similarly, in our case, Stonegate, a minority Participation Interest holder, contends it had the right to force the majority (86.61%) of the Participation Interests to foreclose in lieu of accepting a $9 million settlement.  The Participation Agreement simply does not give Stonegate that right.

In <u>Beal Savings Bank v. Sommer</u>, 8 N.Y. 3d 318, 865 N.E. 2d 1210 (Ct. App. N.Y. 2007), one lender under a syndicated loan arrangement filed a breach of contract claim against the other 36 lenders to the agreement for failing to take certain action against the borrower when it defaulted.  The controlling agreement contained a provision allowing, upon the borrower's default, two-thirds majority of the lenders to direct the administering bank to exercise all rights and remedies they elect.  95.5% of the lenders approved a settlement with the borrower.  The plaintiff's assignor was the only lender which did not approve the settlement.  The court upheld the majority's decision.  The court held:

> The specific, unambiguous language of several provisions, read in the context of the agreements as a whole, convinces us that, in this instance, <u>the lenders intended to act collectively in the event of the borrower's default</u> and to preclude an individual lender from disrupting the schemes of the agreements at issue. (Emphasis added).

<u>Id.</u> at 321, 1211.

The above cases demonstrate that courts uphold a lead bank's right to settle with the borrower upon a default after obtaining approval from the requisite percentage of the participation interests, for less than the amount owed under the loan, even over the objection of participants.

### 5. Stonegate's Course of Conduct Corroborates TD Bank's Construction of the Participation Agreement

Under Georgia law, it is well settled that "[t]he construction placed upon a contract by the parties thereto, as shown by their acts and conduct, is entitled to much weight and may be conclusive upon them." <u>McKinley v. Coliseum Health Group, LLC</u>, 308 Ga. App. 768, 771, 708 S.E. 2d 682, 685 (Ct. App. Ga. 2011) (citation omitted).  In <u>McKinley</u>, the court considered course of conduct evidence in affirming summary judgment.

Here, the earlier versions of the Participation Agreement executed by Stonegate's predecessor-in-interest in 2006 and 2007 had different percentage approval thresholds in Sections 16(b).  The initial 2006 Participation Agreement required unanimity in section 16(b) to take action (DE 47-21).   That percentage was reduced to 50% in the 2007 Participation Agreement (DE 47-22), and later raised to 75% in the 2008 Participation Agreement (DE 47-23).  (Flint Decl. at ¶ 25).     The initial 2006 Participation Agreement also required unanimity in Section 16(e); that percentage was reduced to 50% in both the 2007 and 2008 Participation Agreements.  Id.

Stonegate claims that under Section 16(e), 100% of the Participation Interests were required to approve a mutually agreeable course of action upon default.  While that is what the 2006 signed Participation Agreement stated, the operative 2008 Participation Agreement (Ex. A to Compl.) provides that 50% of the Participation Interests may agree to a resolution in the event of the Borrower's default.

Flint also testified "Section 16(e) required a lower approval threshold (50% of Participation Interests) than Section 16(b) (75%) because Section 16(e) specifically dealt with actions after the Borrower defaulted.  A non-performing loan creates a more time-sensitive problem for the lenders which requires fast action, and Section 16(e) gave the lenders more flexibility if 50% of the Participation Interests wanted to agree to a certain course of action instead of filing a foreclosure action."   (Flint Decl. at ¶ 26).

Moreover, Stonegate's contemporaneous conduct demonstrates that it interpreted the Participation Agreement as permitting a Loan Sale with the requisite approval by a certain percentage of Participating Banks.  Stonegate voted in favor of pursuing a Loan Sale.  Stonegate then proposed various amounts it would vote in favor of (all of which were less than the amount

17

owed by the Borrower).  Stonegate never took the position that the Loan Sale was unauthorized, until a month and a half after it received and accepted $962,659.62 from the Loan Sale proceeds, and Stonegate never objected to or questioned the authority of the Participating Banks to sell the Loan until after it was paid.  (Flint Decl. at ¶ 23).

Stonegate's Barnhart took the position at his deposition that even had <u>100</u>% of Participation Interests agreed to the Loan Sale, it would have been unauthorized under the Participation Agreement (Barnhart Dep. at p. 66).   This is flatly inconsistent with Stonegate's voting to pursue a loan sale and proposing, on three separate occasions, agreeable sale prices for a loan sale.

### 6.    <u>Plaintiff's Willful Misconduct Claim</u>

Stonegate's willful misconduct claim is premised upon TD Bank having breached the Participation Agreement.  (<u>See</u> Compl. at ¶¶ 20, 33-34).   Count III alleges that "[n]otwithstanding Stonegate's unequivocal refusal to approve the Loan Sale Agreement and without Stonegate's consent or authorization, TD Bank sold Stonegate's Participation Interest at a substantial discount."  (Compl. at ¶ 33).  Count III further alleges "TD Bank sold Stonegate's Participation Interest with conscious indifference and reckless disregard to Stonegate's rights." (Compl. at ¶ 36).

Plaintiff's willful misconduct claim hinges upon it proving that TD Bank breached the Participation Agreement.  Consequently, if TD Bank was authorized to sell the Loan under either (or both) Sections 16(b) or 16(e), it necessarily follows that it could not have acted willfully.

As an independent ground supporting summary judgment on Stonegate's willful misconduct claim, no evidence exists that TD Bank acted maliciously, willfully, or wantonly required to support such a claim.  See <u>Munn v. CPI Images, LLC</u>, 2011 WL 3903401, at *1 (11th

Cir. Sept. 7, 2011) (applying Georgia law, and holding that "[w]illful conduct is conduct which evidences an intent to inflict injury").

In fact, Barnhart acknowledged at his deposition that "I don't think they [TD Bank] acted in bad faith" and stated that he found TD Bank's Flint to be "truthful" and "honest."  (Barnhart Dep. at p. 89).  This admission by Stonegate is the direct opposite of "willful misconduct." Therefore, regardless of whether Stonegate is successful under its two contract-based claims, TD Bank cannot be liable for "willful misconduct" as a matter of law.

## IV.  <u>Conclusion</u>

For the above reasons, TD Bank respectfully requests moves for summary judgment against Stonegate as to all Counts of the Complaint, and award all other relief that is appropriate.

Respectfully submitted this 18th day of June, 2013.

<u>s/ Scott L. Cagan</u>
Scott L. Cagan (Florida Bar No. 822681)
scott.cagan@gray-robinson.com
Cortney R. Kaiserman (Florida Bar No. 10443)
cortney.kaiserman@gray-robinson.com
GRAYROBINSON, P.A.
401 East Las Olas Boulevard, Suite 1850
Fort Lauderdale, Florida  33301
Telephone: (954) 761-8111
Facsimile:  (954) 761-8112
*Attorneys for Defendant TD Bank, N.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>s/ Scott L. Cagan</u>
Scott Cagan

**SERVICE LIST**
**STONEGATE BANK v. TD BANK, N.A.**
**CASE NO. 12-61521-CIV-DIMITROULEAS/SNOW**
**United States District Court, Southern District of Florida**

Michael P. Hamaway, Esq.
mhamaway@mbhlawyer.com
Joshua L. Zipper, Esq.
jzipper@mbhlawyer.com
Mombach, Boyle & Hardin, P.A.
500 East Broward Boulevard
Suite 1950
Fort Lauderdale, FL 33394
Telephone:  (954) 467-2200
Facsimile:  (954) 467-2210
*Attorneys for Plaintiff Stonegate Bank*